IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | |
| ) | **FILED UNDER SEAL** |
| **BORON CAPITAL, LLC,** ) | **JURY TRIAL DEMANDED** |
| **BC HOLDINGS 2017, LLC,** ) | |
| **UNITED BNB FUND 2018, LLC, and** ) | |
| **BLAKE ROBERT TEMPLETON,** ) | |
| ) | **5-22CV0114-C** |
| Defendants. ) | |

2022 JUN 14 AM 8:31

DEPUTY CLERK BMH

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges:

### NATURE OF THE ACTION

1.  The Commission brings this action to halt an ongoing, multi-million dollar securities fraud directed at individual investors being perpetrated by Boron Capital, LLC ("Boron"), BC Holdings 2017, LLC ("BC Holdings"), United BNB Fund 2018, LLC ("United"), and Blake Robert Templeton ("Templeton") (collectively, "Defendants").

2.  From 2011 to February 2022, Templeton raised more than $18.7 million from investors in connection with various real estate developments: $8,827,073 through Boron, $5,450,000 through BC Holdings, and $4,467,240 through United. Templeton has used more than $14,000,000 of these investors' funds in the purchase, development, and operation of a ten-acre wedding venue in Red Oak, Texas called the Dallas Oasis. Templeton also used some investor funds to make Ponzi payments directly to other investors.

3.  Between January 2018 and February 2022, Templeton raised nearly $4.5 million

by offering and selling investment units in United, a company managed by Boron. To sell interests in United, Templeton made several claims, including telling potential investors that United's assets were secured by a mortgage position and a "UCC-1 Lien" on the Dallas Oasis, that a renowned business executive served on Boron's board of directors, and that United would deliver investors an audited balance sheet at the end of each fiscal year. None of these statements was true.

4. From March 2021 to December 2021, Templeton raised nearly $5.5 million by offering and selling promissory notes issued by BC Holdings. Each note stated that it was "secured by a Deed of Trust" on the Dallas Oasis. This representation was false.

5. In reality, as described further below, Templeton continued to raise funds for the improvement of the Dallas Oasis without securing the interests of United investors or BC Holdings noteholders in the Dallas Oasis through a mortgage, deed of trust, a UCC-1 lien, or any other instrument. To the contrary, in June 2021, Templeton solicited and obtained a $3.5 million loan from an investor ("Investor 1") in BC Holdings in exchange for a deed of trust in the Dallas Oasis, which Templeton registered in Ellis County, Texas. At the same time, Templeton executed an agreement on behalf of the BNB Fund, which subordinated its interest in the Dallas Oasis and other property to Investor 1.

6. Only after granting Investor 1 a deed of trust in the Dallas Oasis and explicitly subordinating the interests of BNB Fund investors did Templeton eventually file any deed of trust in Ellis County in connection with the BNB Fund or BC Holdings noteholders, filing one deed later in June 2021 and the rest in November 2021. Templeton did not disclose Investor 1's superior security interest to United or BC Holdings investors.

7. Investor 1's note matured on December 15, 2021, and the note's extension periods expired on March 15, 2022. With penalties, BC Holdings now owes Investor 1 more than $4

million, secured by Investor 1's registered deed of trust on the Dallas Oasis, a property with an appraised market value of just $2.15 million, according to Ellis County tax assessor records.

8.  Through their actions, Defendants violated, and unless enjoined will continue to violate, the antifraud and securities-registration provisions of the federal securities laws, namely Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)].

9.  To protect the public from further fraudulent activity, the SEC brings this action against Defendants and seeks: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains, plus prejudgment interest; and (iii) civil penalties. Because of the ongoing nature of the fraudulent offering and the risk of asset dissipation, the Commission also seeks against Defendants emergency relief, including a temporary restraining order, an asset freeze, appointment of a receiver, an accounting, and orders expediting discovery, permitting alternative means of service, and prohibiting alteration or destruction of documents.

## DEFENDANTS

10.  **Boron Capital, LLC** is a Nevada limited liability company formed in 2006 and based in Lubbock, Texas. Templeton and his wife own the company, holding 80% and 20% ownership interests, respectively. Neither Boron nor its securities are registered with the Commission or with any state in any capacity.

11.  **BC Holdings 2017, LLC** is a Wyoming limited liability company formed in January 2018, based in Lubbock, Texas, and wholly owned by Templeton. Neither BC Holdings nor its securities are registered with the Commission or with any state in any capacity. On June 2,

2022, records from the Wyoming Secretary of State's Office showed that, as of March 11, 2022, the company's status was "Inactive - Administratively Dissolved (Tax)."

12. **United BNB Fund 2018, LLC** is a Texas limited liability company based in Lubbock, Texas. Templeton formed it in October 2017 under another name and changed its name to United BNB Fund 2018, LLC on January 30, 2018, when the company began business operations. It operates as an investment fund managed by Boron. Neither United nor its securities are registered with the Commission or with any state in any capacity.

13. **Blake Robert Templeton**, age 37, resides in Lubbock, Texas. He founded Boron and serves as its CEO and managing member. At all relevant times, Templeton has controlled Boron, BC Holdings, and United.

## JURISDICTION AND VENUE

14. The Commission brings this action pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

15. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

16. The Defendants offered and sold to investors promissory notes issued by Boron and BC Holdings and investment units issued by United. These notes and investment units are securities because they fall under the description of notes and investments contracts, respectively, under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], both of which are securities.

17.     In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the mails or the means or instruments of transportation or communication in interstate commerce by, among other means, soliciting investments via the internet and accepting investor deposits via wire transfer.

18.     Venue is proper in this District because, at all relevant times, Defendants were located in and conducted business in this District, and Templeton resided in this District. Further, acts, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District, including but not limited to Defendants' solicitations of investors, acceptance of investment proceeds, and Templeton's operation of Boron, BC Holdings, and United business.

## FACTUAL ALLEGATIONS

### I.     Initial House-Flipping Business

19.     Templeton founded Boron in 2006 to operate a house-flipping business. From its inception through September 2011, the company sustained its operations using revenue generated from flips and from bank financing. During this period, Templeton claims that Boron engaged in at least 237 real-estate transactions, including buying, refinancing, and selling individual properties.

### II.    Templeton's Securities Offerings

20.     In 2011, Templeton began soliciting investors to raise additional capital for his business. Templeton advertised the investment opportunities on Boron's website and used Twitter, YouTube, and other social-media platforms to drive traffic to Boron's website. Using these tools, Templeton and Boron engaged in general solicitation, offering to sell securities to investors with whom Templeton had little or no preexisting, substantive relationships, including unaccredited

investors, in multiple states. Templeton offered and sold securities in three distinct forms: (1) promissory notes issued by Boron, (2) investment units in United, and (3) promissory notes issued by BC Holdings. None of these offerings was registered with the SEC. As described below, Templeton made materially false statements in soliciting investments in each of these unregistered securities offerings.

### a. Boron Promissory Notes

21. Boron issued 55 unsecured promissory notes between September 2011 and October 2020 (collectively, the "Boron Notes") to 36 investors in nine states, raising $8,827,073. The notes featured interest rates ranging from 8% to 36%. Most of the notes provided that Boron would use the offering proceeds for acquisition costs and investments associated with unspecified real-estate projects. Templeton and Boron used the investor funds primarily for this purpose.

22. On January 30, 2018, Boron purchased a ten-acre property in Ellis County, Texas, approximately 25 miles south of Dallas. The property, known as the "Dallas Oasis," featured a large home with a tennis court, a barn, and a swimming pool. Templeton intended for Boron to make additional improvements to develop the property into a commercial wedding venue.

23. Templeton applied approximately $500,000 in proceeds received from the sale of Boron Notes to the $1.1 million purchase price of the Dallas Oasis. For the remaining $600,000, Boron issued two additional promissory notes in January 2018, both secured by a mortgage interest in the Dallas Oasis. Boron paid off these two secured notes on time, in part using funds raised from later unsecured-note investors.

24. No registration statement was filed with the SEC in connection with the offering of Boron Notes.

### b. United Offering

25. By at least early 2018, Templeton and Boron began soliciting investors to purchase membership units in United. From January 2018 through at least February 2022, he raised $4,467,240, selling Class A membership units in United to 16 investors in five states. In offering and selling membership units in United, Templeton and Boron provided investors with a private-placement memorandum ("PPM"), which explained that United was seeking to raise $10 million. The PPM noted that United's operating agreement gave Boron, which served as United's manager and sole Class B member, "exclusive control and management of the Company" and that the company "will be totally dependent on the Manager and its affiliates to manage the business of the Company." Templeton had final authority to approve the contents of the PPM.

26. United's PPM specified that the purpose of the offering was "to secure capital contributions in order to loan funds to BC Holdings 2017, LLC to allow BC Holdings 2017 LLC to purchase and development [sic] of the Property and subsequently operate, increase the value, and sell or refinance the Property for a profit." The PPM defined the "Property" as "numerous wedding and event venues and/or corporate housing assets that BC Holdings 2017, LLC will purchase with the proceeds of the Loan."

27. No registration statement was filed with the SEC in connection with the offering of membership units in United.

### c. BC Holdings Promissory Note Offering

28. From March 12, 2021 through October 8, 2021, Templeton raised $5,450,000 by offering and selling promissory notes issued by BC Holdings to eight investors. All but one of these investors had previously invested in earlier Templeton offerings. Each note purported to be

secured by a deed of trust on the Dallas Oasis. The annual interest rate on these notes ranged from 10% to 12.5%, and the maturity dates ranged from December 15, 2021 through November 5, 2022.

29. No registration statement was filed with the SEC in connection with the BC Holdings promissory note offering.

### III. Material Misstatements Used To Obtain Investments

30. Templeton made several material misstatements in the offer or sale (or in connection with the sale) of the Boron and BC Holdings promissory notes and the membership units in United.

#### a. United Offering Documents and Other Statements

##### i. United Slide Presentation

31. Templeton used a slide presentation to solicit investments in United. Templeton personally approved the materials in the presentation, which stated: "Boron Capital is offering Class A Units in the United BNB Fund for all investors, and **every investor is fully collateralized by the assets and cash-flow of The Fund, which is secured by a mortgage position and a UCC-1 Lien**." (emphasis added).

32. In reality, no security interest of any kind was filed to secure any United loans to BC Holdings until after Templeton filed a deed of trust and assignment of rents to United on November 12, 2021. This deed of trust purported to give United a security interest in all of BC Holdings' land, which by then included the Dallas Oasis and a 27-acre tract of land in Midland, Texas, currently appraised by the taxing authority at $755,920, which Boron had previously conveyed to BC Holdings on December 15, 2020. Until the deed of trust was filed in November 2021, none of the investors who had already invested $4.26 million United by that point was secured by any collateral whatsoever.

33. Five months earlier, however, BC Holdings had already entered into a six-month promissory note with another investor, Investor 1, in exchange for $3.5 million. BC Holdings gave Investor 1 a deed of trust on the Dallas Oasis and a subordination agreement, signed by Templeton, in which United subordinated any past or future security interests in Boron and BC Holdings' personal property or real property, including United's security interests in the Dallas Oasis and the Midland acreage, to Investor 1. Templeton did not disclose the existence of Investor 1's superior security interest to any fund investor or any other note investor.

34. The slide presentation that Templeton used to solicit investments in United further claimed that "Keith Cunningham, the real 'Rich Dad' from Robert Kiyosaki's "Rich Dad Poor Dad" book series, has served on the Board of Directors for Boron Capital and provides business and financial advice. He has 40+ years of experience, started 15 companies, negotiated scores of million-dollar-plus deals, and has structured and negotiated over $1 Billion of financing for business ventures he's been involved in." In reality, Cunningham never served on Boron's board of directors and last spoke to Templeton in 2015. In fact, Boron has never even had a board of directors.

### ii. United PPM

35. The United PPM stated: "The Company will enter into a loan agreement with BC Holdings 2017, LLC that will pay the Company 8% annualized interest payment for a term of five (5) years." It provided that the agreement would be in accord with a form agreement attached to the PPM as an exhibit. In reality, United did not enter into any written loan agreement with BC Holdings until June 2021. This loan agreement, which was styled, "Line of Credit Promissory Note," was backdated to show an effective date of January 30, 2018. Under the terms of the PPM, United had no revenue sources other than BC Holdings.

### iii. United Operating Agreement

36. The Operating Agreement of United BNB Fund 2018, LLC is an agreement between Boron and the purchasers of interests in United, deemed effective October 17, 2017 ("United Operating Agreement"). The United Operating Agreement was provided to each United investor when they invested.

37. The United Operating Agreement stated that, within 60 days of each fiscal year-end, which was December 31, Boron would deliver to the investors an "annual balance sheet of the Company . . . audited by an independent third party certified public accountant." In reality, As Templeton knew as he continued to disseminate the Operating Agreement to new investors, no independent accountant has ever audited United's balance sheet and, therefore, Boron has not delivered audited balance sheets to investors.

### b. BC Holdings Promissory Notes

38. Each BC Holdings note stated that it was "secured by a Deed of Trust" on the Dallas Oasis property. In reality, Templeton recorded the Investor 1 deed of trust in the county records in June 2021 and failed to file deeds of trust as promised to BC Holdings note investors until November 2021,[1] even though most BC Holdings promissory noteholders had invested prior to the investment of Investor 1. As a result, Investor 1's security interest remains superior to that of all other BC Holdings note investors.

### c. Boron's Website

39. Since at least 2019, Boron's website has contained misleading statements about Boron's experience in receiving and handling capital from investors. For example, Boron's

---

[1] BC Holdings delayed until November to execute and file deeds for all but one promissory note. For one $500,000 note from married couple GP and CP, however, BC Holdings signed a deed of trust and filed it in Ellis County on June 24, 2021, only days after doing the same for Investor 1.

website touted the claim that "Boron Capital has invested in over 300+ real estate transactions and no investor has ever lost money with us." While this statement suggests that Boron had extensive experience in handling investor funds, at least 237 of these transactions simply involved Boron's house-flipping transactions in which no investor funds were used.

40.     Boron's website also contained misleading statements concerning the extent of the company's experience managing private equity real-estate funds. Beginning in at least 2019, the website described Boron as "Using 3-dimensional real estate investments to help everyday investors build legacy wealth," and listed United as an "Open Fund," accepting new investors. The website touted ten "Closed Funds," and identified six of those "Funds" as "SFH Portfolio I" through "SFH Portfolio VI." In reality, each of the six identified "Funds" was comprised of house-flipping transactions in which no investor money was used.

41.     Boron's website has contained similar misleading statements concerning its purported investment funds since at least 2014. In January of that year, Templeton testified in a Texas State Securities Board ("TSSB") investigation into his investment offerings. At the time, the website listed "Fund One" and "Fund Two" as closed funds. Templeton testified in the TSSB investigation that these names simply referred to real-estate transactions involving his "own personal funds." While the TSSB took no enforcement action, the TSSB attorney warned Templeton on the record that "the word 'fund' . . . has a specific sort of connotation in the investment world." Despite this warning, Templeton persisted in his misleading use of the word "funds" to exaggerate his experience managing private equity real-estate funds.

### IV.     Misuse of Investor Proceeds

42.     Templeton, who controlled all Boron-affiliated entities' bank accounts, made payments contrary to representations in United's PPM. Under the PPM, United was limited solely

to lending money to BC Holdings under a written loan agreement. As stated above, there was no loan agreement between United and BC Holdings until June 2021. Nevertheless, bank records show that Templeton made numerous payments from United's investment proceeds between June 2018 and October 2020, contrary to his representation in the PPM. These transactions included interest payments to United investors, payments to Boron promissory-note investors, and payments to satisfy obligations on real-estate projects unrelated to United.

### a. Ponzi Payments to United Investors

43. Bank records show instances in which United accounts received investor deposits and immediately disbursed money to *other* United investors to satisfy the interest payments promised them. The records show that no deposits came into United accounts from BC Holdings, United's only source of revenue according to the PPM, and that, apart from the investor deposits, the accounts held insufficient funds at the time to satisfy the promised interest payments to investors. For example:

- From December 19 through 27, 2019, Investors LD, EW, LW, and JK invested $497,000 in a United account that, prior to the investments, had a balance of $11. Between December 31, 2019, and January 6, 2020, United paid $11,729 in interest to Investors BC, BH, and JD.

- On March 31, 2020, Investor LH invested $240,250 in a United account that, prior to the investment, had a balance of $8,133. Over the next week, United paid $21,000 in interest to Investors JG, JD, BC, and BH.

- On July 24, 2020, Investor JP invested $100,000 and on September 22, 2020, Investor PS invested $132,466 in a United account that, prior to the investments, had a balance of $677. From September 30 to October 14, 2020, United paid $44,991 in interest to 11 United investors.

- On November 23, 2020, Investor KH invested $700,000 in a United account that, prior to the investment, had a balance of $681. From December 3, 2020, to February 1, 2021, United paid $48,463 in interest to 11 investors, including KH.

### b. Ponzi Payments to Boron Promissory Note Holders and Payments to Projects Unrelated to United

44. Bank records also reveal transactions in which United accounts received investor money and immediately paid Boron promissory-note holders or paid expenses on real-estate projects unrelated to United. The records show that no deposits came into United accounts from BC Holdings and that, apart from the investor deposits, the accounts held insufficient funds at the time to make these payments. For example:

- On March 16, 2020, Investor LH invested $788,340 in a United account that, prior to the investment, had a balance of $249,469 (97% of which came from investors). Over the next 10 days, Templeton used these funds to pay out $978,620 to four Boron promissory-note investors.

- On June 29 and July 2, 2018, Investor VF invested a total of $41,650 and on July 5, 2018, Investor JG invested $100,000 in a United account that, prior to the investments, had a balance of $24,481. On July 12, 2018, Templeton used $51,000 to pay construction costs on an apartment-complex investment unrelated to United.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]
*Against All Defendants*

45. Plaintiff re-alleges and incorporates paragraphs 1 through 44 of this Complaint by reference as if set forth verbatim in this Claim.

46. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentality of interstate commerce, or of the mails, knowingly or with severe recklessness:

   a. employed a device, scheme, or artifice to defraud; and/or

13

  b. made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

  c. engaged in an act, practice, or course of business which operated as a fraud or deceit upon any person.

  47. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### *Against All Defendants*

  48. Plaintiff re-alleges and incorporates paragraphs 1 through 44 of this Complaint by reference as if set forth verbatim in this Claim.

  49. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

  a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

  b. knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

    50.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)]**
*Against All Defendants*

    51.    Plaintiff re-alleges and incorporates paragraphs 1 through 44 of this Complaint by reference as if set forth verbatim in this Claim.

    52.    By engaging in the conduct described herein, Defendants, directly or indirectly:

a. made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or

b. for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

53. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1. Permanently enjoining the Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2. Ordering the Defendants to disgorge ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

3. Imposing civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein;

4. Imposing such other and further relief as the Court may deem just and proper.

Dated: June 14, 2022                                Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

_/s/ Matthew J. Gulde_____
Matthew J. Gulde
Illinois Bar No. 6272325
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410

Facsimile: (817) 978-4927
guldem@sec.gov

*Attorney for Plaintiff*

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

5-22CV0114-C

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
U.S. SECURITIES AND EXCHANGE COMMISSION

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

### DEFENDANTS
BORON CAPITAL, LLC, BC HOLDINGS 2017, LLC, UNITED BNB FUND 2018, LLC & BLAKE ROBERT ~~TEMPLETON~~

County of Residence of First Listed Defendant  Lubbock
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*            Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [x] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | [ ] 950 Constitutionality of State Statutes |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and

Brief description of cause:
Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE 6/14/2022

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT #  _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.
  (b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)
  (c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: **federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.